**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CONSTANTINE GLINKA, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BOIRON, INC., | |
| Defendant. | |

Plaintiff Constantine Glinka ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Boiron, Inc. ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to the Plaintiff, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Defendant formulates, manufactures, advertises, and sells Boiron Arnicare in all of its various varieties (the "Products") throughout the United States, including in New York.

2. Defendant represents to consumers through its packaging that the Products provide "PAIN RELIEF."

3. Unbeknownst to consumers, however, Defendant's claims are false. The Products are homeopathic "medicine" based on a sham science. And, as numerous studies have shown, arnica montana—the "active ingredient" in the Products—is not effective for providing pain relief.

4. Plaintiff has purchased the Products. Now, on behalf of himself and all others similarly situated, he asserts claims for violations of New York General Business Law §§ 349

1

and 350.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a state different than Defendant.

6. This Court has personal jurisdiction over Defendant because a substantial portion of the events that gave rise to Plaintiff's claims occurred in New York.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events that gave rise to Plaintiff's claims occurred in this District.

## PARTIES

8. Plaintiff Constantine Glinka is a citizen of New York who resides in Brooklyn, New York. In or around March 2025, Mr. Glinka purchased a 2.6 oz package of Boiron Arnicare Gel from a CVS in Brooklyn for approximately $12.49. In purchasing the Products, Mr. Glinka relied on Defendant's false, misleading, and deceptive marketing of the Products as providing "PAIN RELIEF." The Products did not provide Mr. Glinka with any pain relief. Had Mr. Glinka known that Defendant's representations were false and misleading, he would not have purchased the Products or would have only been willing to purchase the Products at a lesser price.

9. Defendant Boiron, Inc. is a corporation organized under the laws of Pennsylvania, with its principal place of business located in Newton Square, Pennsylvania. Defendant formulates, advertises, manufactures, and/or sells the Products throughout New York and the United States.

2

## GENERAL ALLEGATIONS

10. Defendant's labeling on the Products states in large prominent lettering that they provide "PAIN RELIEF."

11. But, unfortunately for consumers, the Products do no such thing.

12. The Products are sold as "homeopathic medicine." But homeopathy is a sham pseudoscience based on magical "principles." Under the homeopathic "principle" of "ultradilution," the more a substance is diluted, the more potent that substance supposedly becomes at treating the symptom due to the release of "vital energies." Modern homeopaths have proposed that water has a memory that allows homeopathic preparations to work without containing the original substance. According to modern medical science, the notion that dilutions can maintain an imprint of substances previously dissolved in them is false.

13. To produce homeopathic remedies, homeopaths use a process called "dynamization," "potentisation," or "ultra-dilution." In that process, a substance is diluted with alcohol or, more commonly, distilled water. Defendant uses the decimal scale to describe the dilution ratio of its active ingredient, arnica montana. Under the decimal scale, the active substance is diluted by a factor of 10 at each stage and is expressed as #C HPUS. Dilution often continues until none of the original substance remains.

14. For example, Arnicare Tablets contain what is called a "9C HPUS" dilution of arnica montana. This means that the arnica montana is diluted to 1/billionth of its original strength. The arnica montana in topical Arnicare creams and gels is diluted to 1/10th its original strength. Thus, even if arnica montana had theoretical medicinal benefits (which it does not), the dosage in the Products is far too small to have a physiological effect on any human being.

15. Homeopathic theory dictates that following each dilution, homeopathic remedies

are vigorously shaken by ten hard strikes against an elastic surface. Homeopaths term this process "succession." Each dilution followed by succession is assumed to increase the effectiveness of the remedy. Homeopaths call this process of ultra-dilution and succession "potentization." The founder of homeopathy, Samuel Hahnemann, developed this procedure in the 18th century after deciding that preparations subjected to agitation in transit, such as saddle bags or in a horse carriage, were more "potent."

16. Modern science refutes these principles. The homeopathic contention that decreasing the concentration (or dosage) of a drug increases its therapeutic activity is contrary to modern medicine and the dose-response relationship. Systematic reviews and meta-analyses have conclusively demonstrated that homeopathic products perform no better than placebos.

17. For example, in a study of homeopathic remedies commissioned by the British Government, medical scientists repeatedly expressed their criticisms of homeopathy and its proponents:

> We regret that advocates of homeopathy … choose to rely on, and promulgate, selective approaches to the treatment of evidence base as this risks confusing or misleading the public, the media and policy makers . . . .

House of Commons, Science and Technology Committee, Evidence Check 2: Homeopathy, Fourth Report, 2009-10, HC 45, ¶ 73 (U.K.).

> In our view, the systematic reviews and meta-analyses conclusively demonstrate that homeopathic products perform no better than placebos.

*Id.* at ¶ 70.

> There has been enough testing of homeopathy and plenty of evidence showing that it is not efficacious . . . .

*Id.* at ¶ 77.

4

For patient choice to be real choice, patients must be adequately informed to understand the implications of treatments. For homeopathy this would certainly require an explanation that homeopathy is a placebo. When this is not done, patient choice is meaningless. When it is done, the effectiveness of the placebo – that is, homeopathy – may be diminished.

*Id.* at ¶70.

18.     After its investigation, the British Government found that:

[T]he evidence base shows that homeopathy is not efficacious (that is, it does not work beyond the placebo effect) and that explanations for why homeopathy would work are scientifically implausible. . . . The [Science and Technology] Committee concluded, given that the existing scientific literature showed no good evidence of efficacy, that further clinical trials of homeopathy could not be justified. . . . In the Committee's view, homeopathy is a placebo treatment and the Government should have a policy on prescribing placebos. Prescribing of placebos is not consistent with informed patient choice, which the Government claims is very important, as it means patients do not have all the information needed to make choice meaningful. . . . Beyond ethical issues and the integrity of the doctor-patient relationship, prescribing pure placebos is bad medicine. Their effect is unreliable and unpredictable and cannot form the sole basis of any treatment on the NHS.

Press Release, Science and Technology Committee, MPS Urge Government to Withdraw NHS Funding and MHRA Licensing of Homeopathy (Feb. 22, 2010).

19.     In 2005, Dr. Matthias Egger and colleagues from the University of Bern in Switzerland analyzed 110 placebo-controlled homeopathy trials and compared the results to the same number of trials of conventional drugs. Published in the British journal The Lancet, the study found that the benefits from the homoeopathic remedies were entirely compatible with the placebo effect. The researchers continued: "the findings were less surprising than the fact that debate over homeopathy continues, despite 150 years of unfavorable findings . . . ." Aijing Shang, *Are The Clinical Effects of Homoeopathy Placebo Effects? Comparative Study of*

*Placebo-controlled Trials of Homoeopathy and Allopathy*, The Lancet, Vol. 366, at 726-32 (Aug. 27, 2005).

20.     Michael Levy, director of the Food and Drug Administration's ("FDA's") division of new drugs and labeling compliance, stated that the FDA is "not aware of any evidence that shows homeopathic drugs are effective." FDA Online Label Repository Webpage, http://labels.fda.gov/. Likewise, the American medical establishment has long rejected the science underlying homeopathic studies because the compounds are too diluted to retain any meaningful, measurable medicinal value. "Science tells us that most of these medicines aren't useful," said Dr. Wayne Yankus, a Midland Park pediatrician, discussing the efficacy of homeopathic remedies. Colleen Diskin, *Parents Look To Homeopathy As Alternative To Over-The-Counter Cold Medicines*, The Record (Dec. 19, 2010).

21.     As Professor David Colquhoun, Professor of Pharmacology at University College London, put it: "If homeopathy worked the whole of chemistry and physics would have to be overturned." House of Commons, Science and Technology Committee, Evidence Check 2: Homeopathy, Fourth Report, 2009-10, HC 45 (U.K.).

22.     Furthermore, reliable clinical trials repeatedly demonstrate that homeopathic remedies are only as effective as placebos. The authors of the Homeopathy Comparative Study, cited above, concluded that "when analyses were restricted to large trials of higher quality there was no convincing evidence that homeopathy was superior to placebo."

23.     The American Medical Association and the National Health Service have reached the same conclusion, and both have issued statements that no scientific evidence supports the use of homeopathic treatments in medicine.

24.     Even homeopathy's own supporters, such as the National Center for

Complementary and Alternative Medicine, have been forced to admit that "[t]here is [] no condition for which homeopathy has been proven effective."

25. Numerous scientific studies have demonstrated that these criticisms of homeopathy apply with equal weight to homeopathic arnica in particular, such as that in the Products. Indeed, these studies show that arnica does not provide pain relief, and is not effective in the treatment or improvement of pain.

26. In 1984, the British Journal of Oral and Maxillofacial Surgery published a study by G S Kaziro entitled *Metronidazole (Flagyl) And Arnica Montana in the Prevention of Post-Surgical Complications, a Comparative Placebo Controlled Clinical Trial*. This study reported on a double-blind trial with 118 patients who underwent the removal of impacted wisdom teeth and were randomly divided into the following groups: 41 patients received Metronidazole, 39 patients received arnica montana, and 38 patients received a placebo. The clinical trial found that "[a]rnica montana appeared to give rise to greater pain than placebo (p<0.05) and caused more swelling than the placebo (p<0.01)."

27. In 1998, the Clinical Journal of Pain published a study by A J Vickers et al. entitled *Homeopathic Arnica 30× Is Ineffective for Muscle Soreness After Long-Distance Running: A Randomized, Double-Blind, Placebo-Controlled Trial*. There, a randomized, double-blind placebo-controlled trial with 519 participants found that homeopathic arnica was ineffective for muscle soreness when compared to a placebo.

28. Also in 1998, the JAMA Archive of Surgery published a paper by E. Ernst et al. entitled *Efficacy of Homeopathic Arnica: A Systematic Review of Placebo-Controlled Clinical Trials*. This meta-analysis reviewed eight separate clinical trials of arnica and concluded that "[t]he claim that homeopathic arnica is efficacious beyond a placebo effect is not supported by

7

rigorous clinical trials."

29.     In 2003, the Journal of the Royal Society of Medicine published a study by C. Stevinson et al. entitled *Homeopathic Arnica for Prevention of Pain and Bruising: Randomized Placebo-Controlled Trial in Hand Surgery*.  In this study, 64 adults undergoing elective surgery for carpal tunnel syndrome were randomly assigned to take either three tablets daily of homeopathic arnica 30C or 6C or a placebo for seven days before surgery and fourteen days after surgery.  The study found that homeopathic arnica did not have an advantage over a placebo in reducing postoperative pain, bruising, and swelling.

30.     In 2010, the Annals of Pharmacotherapy published a study by J. D. Adkison entitled *The Effect of Topical Arnica on Muscle Pain, Annals of Pharmacotherapy*.  There, a randomized, double-blind, placebo-controlled trial was conducted in 53 subjects.  Each participant received two tubes of cream, one with active arnica and one with placebo.  The trial found that rather than decreasing pain, arnica correlated with an increase pain 24 hours after eccentric calf exercises.

31.     In 2013, the journal Complementary Therapies in Medicine published a paper by T. Barlow et al. entitled *The effect of complementary therapies on post-operative pain control in ambulatory knee surgery: A systematic review*.  This meta-analysis reviewed five separate studies and concluded that arnica "did not affect post-operative pain."

32.     Defendant has profited enormously from its false and misleading representations. The purpose of this action is to require Defendant to change its labeling claims and to provide consumers with monetary relief for its deceptive and misleading product claims.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff seeks to represent a class defined as all persons in the United States who, during the maximum period of time permitted by law, purchased the Products for personal,

family, or household consumption, and not for resale (the "Nationwide Class").

34. Plaintiff also seeks to represent a subclass defined as all person in New York who purchased the Products (the "New York Subclass") (collectively with the Nationwide Class, the "Classes").

35. **Numerosity Fed. R. Civ. P. 23(a)(1).** Members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the millions. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

36. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)).** There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact that exist as to all Class members and predominate over questions affecting only individual Class members include, but are not limited to:

(a) the effectiveness of arnica for treating pain;

(b) whether Defendant's marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive and misleading; and

(c) whether Plaintiff and members of the Classes have suffered damages as a result of Defendant's actions, and the amount thereof.

37. **Typicality (Fed. R. Civ. P. 23(a)(3)).** The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff was exposed to Defendant's false and misleading marketing, purchased Defendant's Products, and suffered a loss as a result of those purchases.

38. **Adequacy (Fed. R. Civ. P. 23(a)(4)).** Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Class members she

9

seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

39. **Superiority (Fed. R. Civ. P. 23(b)(3)).** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Even if every member of the Classes could afford to pursue individual litigation, the court system could not. Individualized litigation would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also increase the delay and expense to all parties and would present the potential for varying, inconsistent, or contradictory judgments—magnifying the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. In contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues would ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION
## COUNT I

**Violation of the New York General Business Law § 349**
**(On behalf of the New York Subclass)**

40. Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

41. Plaintiff brings this cause of action on behalf of herself and members of the New York Subclass against Defendant.

42.     Plaintiff and New York Subclass members are "persons" within the meaning of the GBL § 349(h).

43.     Defendant is a "person, firm, corporation or association or agent or employee thereof" within the meaning of GBL § 349(b).

44.     Under GBL § 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce are unlawful."

45.     Defendant made false and misleading statements by marketing the Products as providing "PAIN RELIEF" when they do no such thing.

46.     In doing so, Defendant engaged in deceptive acts or practices in violation of GBL § 349.

47.     Defendant's deceptive acts or practices were materially misleading.  Defendant's conduct was likely to and did deceive reasonable consumers, including Plaintiff, about the quality of its Products, as discussed throughout.

48.     Plaintiff and New York Subclass members were unaware of, and lacked a reasonable means of discovering, the material facts that Defendant withheld.

49.     Defendant's actions set forth above occurred in the conduct of trade or commerce.

50.     The foregoing deceptive acts and practices were directed at consumers.

51.     Defendant's misleading conduct concerns widely purchased consumer products and affects the public interest.  Defendant's conduct includes unfair and misleading acts or practices that have the capacity to deceive consumers and are harmful to the public at large. Defendant's conduct is misleading in a material way because they fundamentally misrepresent the production and quality of the Products.

52.     Plaintiff and New York Subclass members suffered ascertainable loss as a direct

and proximate result of Defendant's GBL violations in that: (i) they would not have purchased the Products had they known the truth; and (ii) they overpaid for the Products on account of the misrepresentations and omissions, as described herein. As a result, Plaintiff and New York Subclass members have been damaged either in the full amount of the purchase price of the Products or in the difference in value between the Products as warranted and the Products as actually sold.

53. On behalf of herself and other members of the New York Subclass, Plaintiff seeks to enjoin Defendant's unlawful acts and practices described herein, to recover actual damages or $50, whichever is greater, reasonable attorney's fees and costs, and any other just and proper relief available under GBL § 349.

## COUNT II

### Violation of the New York General Business Law § 350
### (On behalf of the New York Subclass)

54. Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

55. Plaintiff brings this cause of action on behalf of herself and members of the New York Subclass against Defendant.

56. GBL § 350 provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

57. Defendant's labeling and advertisement of the Products was false and misleading in a material way. Specifically, Defendant advertised the Products as providing "PAIN RELIEF" when they do no such thing.

58. This misrepresentation was consumer-oriented and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

59. This misrepresentation has resulted in consumer injury or harm to the public interest.

60. As a result of this misrepresentation, Plaintiff and New York Subclass members have suffered economic injury because: (i) they would not have purchased the Product had they known the truth; and (ii) they overpaid for the Products on account of the misrepresentations and omissions, as described herein. As a result, Plaintiff and New York Subclass members have been damaged either in the full amount of the purchase price of the Products or in the difference in value between the Products as warranted and the Products as actually sold.

61. By reason of the foregoing and as a result of Defendant's conduct, Plaintiff and New York Subclass members seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, reasonable attorneys' fees and costs, and any other just and proper relief available under GBL § 350.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Nationwide Class and the New York Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Nationwide Class and the New York Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Nationwide Class and New York Subclass;

(b) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(c) For an order finding in favor of Plaintiff, the Nationwide Class, and the New York Subclass on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For an order enjoining Defendant from continuing the illegal practices detailed herein and compelling Defendant to undertake a corrective advertising campaign; and

(h)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: April 28, 2026          **ARISOHN LLC**

By: * /s/ Joshua D. Arisohn *
        Joshua D. Arisohn

Joshua D. Arisohn
94 Blakeslee Rd.
Litchfield, CT 06759
Telephone: (646) 837-7150
Email: josh@arisohnllc.com

*Attorney for Plaintiff*